IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | CASE NO.: 1:24-CR-00151 |
| | ) | |
| Plaintiff, | ) | JUDGE J. PHILIP CALABRESE |
| | ) | |
| v. | ) | |
| | ) | |
| YUE CAO, | ) | GOVERNMENT'S TRIAL BRIEF |
| | ) | |
| Defendant. | ) | |
| | ) | |
| | ) | |

The United States of America, by and through its counsel, David M. Toepfer, United

States Attorneys, and Assistant United States Attorneys Edward D. Brydle and Michael L.

Collyer, and respectfully submit the Government's Trial Brief in accordance with this Court's

Trial Order.

Respectfully submitted,

DAVID M. TOEPFER
United States Attorney

By:    /s/ Michael L. Collyer
Edward D. Brydle (OH: 0083243)
Assistant United States Attorney
Michael L. Collyer (OH: 0061719)
Assistant United States Attorney
801 West Superior Avenue, Suite 400
Cleveland, OH 44113
(216) 622-3875
(216) 522-2403 (facsimile)
Edward.Brydle@usdoj.gov
Michael.Collyer@usdoj.gov

## Table of Contents

I.     STATEMENT OF FACTS .................................................................................................3

II.    INDICTMENT ...............................................................................................................6

III.   ELEMENTS OF THE OFFENSES ...............................................................................7

IV.   ANTICIPATED EVIDENTIARY ISSUES.....................................................................9

      A.    SUMMARY EVIDENCE DEMONSTRATIVES ARE THEMSELVES ADMISSIBLE....................................................................................................9

      B.    THE COURT SHOULD PERMIT THE PRESENCE OF THE GOVERNMENT'S AGENT AT TRIAL .............................................................10

      C.    THE GOVERNMENT MAY INTRODUCE EVIDENCE OF UNCHARGED EXECUTIONS OF THE SCHEME TO COMMIT BANK FRAUD...................10

      D.    ATTACKS ON THE GOVERNMENT'S INVESTIGATION ARE IRRELEVANT. .................................................................................................11

      E.    IF THE COURT ALLOWS THE DEFENSE TO QUESTION THE CONDUCT OF THE INVESTIGATION, THE GOVERNMENT IS ALLOWED TO DEFEND ITS INVESTIGATION WITH EVIDENCE THAT WOULD OTHERWISE NORMALLY BE CONSIDERED HEARSAY. ...........................14

      F.    DEFENDANTS' SELF-SERVING EXCULPATORY STATEMENTS ARE NOT ADMISSIBLE. ...............................................................................15

      G.    WHOIS DATA IS ADMISSIBLE UNDER FEDERAL RULE OF EVIDENCE 803(17)..........................................................................................................16

      H.    USE OF FBI INTERVIEW REPORTS .................................................................17

      I.    REFERENCES TO CONSEQUENCES OF GUILTY VERDICT ......................21

V.    CONCLUSION............................................................................................................23

## I.    STATEMENT OF FACTS

From on or about June 22, 2015, to on or about June 24, 2022, Defendant was employed by Key Bank (Key Bank) as a quantitative modeling analyst, with access to substantial customer and client information, including account information.  Defendant was a fully remote employee who worked from his residence.  Defendant left his position at Key Bank on or about June 24, 2022.  Defendant was hired at Charles Schwab (Bank 2) shortly thereafter and worked on building models for internal systems designed to predict and track fraud.

In April 2023, Charles Schwab's internal systems identified a previous transfer of approximately $50,000 from Beverly G█████'s (Victim 1) bank account at Key Bank into Defendant's Charles Schwab checking account.  Charles Schwab personnel reviewed Defendant's accounts and identified the following series of transactions between G████'s account at Key Bank and Defendant's accounts at Charles Schwab:

| Approximate Date | Amount | Originating Account | Receiving Account |
|---|---|---|---|
| January 4, 2023 | $100 | G████'s Key Bank savings | Defendant's Charles Schwab checking |
| January 6, 2023 | $5,000 | G████'s Key Bank savings | Defendant's Charles Schwab checking |
| January 27, 2023 | $5,100 | Defendant's Charles Schwab checking | Defendant's Charles Schwab brokerage |
| February 6, 2023 | $50,000 | G████'s Key Bank savings | Defendant's Charles Schwab checking |
| February 9, 2023 | $50,100 | Defendant's Charles Schwab checking | Defendant's Charles Schwab brokerage |

In or around March 2023, G█████ notified her local Key Bank branch that the withdrawals from her savings account were unauthorized.

Charles Schwab identified email notifications it sent to Defendant's personal email address related to linking G████'s Key Bank savings account to Defendant's Charles Schwab checking account.  Once the unauthorized transfers were complete and deposited into

Defendant's Charles Schwab brokerage account, Defendant began trading within his brokerage account and received email notifications when the trades occurred.

On or about April 17, 2023, Defendant attempted to link three additional Key Bank customer accounts to his Charles Schwab brokerage account. At this point, Charles Schwab had switched to a new internal software system for monitoring account linkages to external banks. The system captured Defendant's attempts but denied the linkage as Defendant's social security number ("SSN") did not match the Key Bank victims' SSNs. Two of the attempted account links occurred from Defendant's home residential internet protocol ("IP") address. After an internal review of this activity by Charles Schwab, there was no evidence that anyone other than Defendant had accessed his accounts.

Defendant was interviewed by Charles Schwab on April 18, 2023, and April 20, 2023, related to this activity, and each time denied any wrongdoing, claiming he was unaware of the unauthorized banking activity in his accounts. Defendant was fired from Charles Schwab on April 20, 2023. Five days later, Defendant filed a complaint with the Federal Bureau of Investigation ("FBI") Internet Crimes Complaint Center claiming his accounts and/or internet router had been hacked.

Charles Schwab notified Key Bank, Defendant's previous employer, of the unauthorized activity involving their customers. Key Bank conducted an internal investigation into Defendant's activity during the period Defendant was employed with Key Bank. Key Bank identified several unauthorized online banking accounts believed to be opened by Defendant using the personal identifying information of very elderly customers of Key Bank. Other targeted Key Bank accounts had not yet enrolled in online banking—a feature that Key Bank offered its customers. The investigation revealed Defendant enrolled several of these customers

in online banking, thereby giving him full control of these victims' bank accounts.  A similar email address naming convention was used for each of the Key Bank online banking accounts opened.  The email addresses used to open the unauthorized accounts typically began with the victim's first name or initial, then last name, then year of birth, and contained the same domain name.[1]

The investigation also identified several instances of money transfers between the Key Bank customer accounts and the unauthorized Key Bank accounts opened in their name. However, in other instances, Defendant transferred money from Key Bank customer accounts to accounts at other financial institutions.  The accounts at the other financial institutions receiving the unauthorized transfers were (1) unauthorized accounts opened using the victims' identities, and (2) Defendant's own personal accounts.  Key Bank worked with other financial institutions to claw back as many of the unauthorized transactions it could.  Key Bank also notified law enforcement of its investigation.

After receiving the complaint from Key Bank, the FBI conducted its own investigation. This investigation eventually focused on the unauthorized transfers, and attempted transfers, from Key Bank accounts to other financial institutions.  FBI developed several other pieces of evidence that implicated Defendant in the scheme including: unauthorized victim accounts opened at financial institutions where Defendant also had a personal account, evidence of account linkages (and linkage attempts) with Defendant's personal accounts, multiple credit card payments on Defendant's personal account from a victim's account at Key Bank, and multiple

---

[1]    Special Agent Baldwin attempted to obtain information from the email provider associated with this domain, a company based in Germany, but the provider does not maintain subscriber data for inactive accounts and the email accounts at issue were inactive by the time she contacted the provider.  Attempts to request any available account information via international partners were unsuccessful due to privacy laws.

unauthorized transfers of money from victims' account at Key Bank to Defendant's personal checking and brokerage accounts.  The investigation also uncovered a few instances of matching ATT Mobile IP addresses whereby, on the same day, the same IP address accessed a personal account of the Defendant's and an unauthorized account in the name of a Key Bank victim.

In April 2024, a search warrant was executed on Defendant's personal email address. Located within his messages were a series of emails from the United States Postal Services (USPS) Informed Delivery service—a service that allowed Defendant to preview images of incoming mail.  Several emails from July through December 2022 from USPS Informed Delivery contained images of envelopes from Bluebird that were American Express prepaid debit cards.  Incomm Financial Services, Inc., who manages the program and is the records custodian associated with the Bluebird accounts, will testify that their records demonstrate that several prepaid cards were ordered online in the names of four Key Bank customers, including three of the four named victims, and directed to Defendant's home address.

Additionally, brokerage accounts at Tastytrade, a popular brokerage for options traders, were opened in the name of two of the Key Bank victims around the same time Defendant opened his own account.  During four days in 2022, one of the victim accounts and Defendant's account appeared to be trading options between each other—activity that was indicative of moving funds between accounts.  Eventually, a few weeks after the account was opened, Tastytrade returned $30,000 in previously deposited funds to the victim's Key Bank account.

## II.    INDICTMENT

A grand jury indicted Defendant was on May 1, 2024, and charged with eleven counts of Bank Fraud pursuant to 18 U.S.C. § 1344, five counts of Aggravated Identity Theft pursuant to 18 U.S.C. § 1028A, and one count of Engaging in Monetary Transactions in Criminally Derived

Property pursuant to 18 U.S.C. § 1957.  (R. 1: Indictment, PageID 17-24).  On November 15, 2024, the Government filed a motion to dismiss two counts of the Indictment related to Victim 3 and the associated forfeiture charge.  On April 24, 2024, the Court granted the motion and dismissed Counts 6 and 14 of the Indictment.  On November 18, 2025, the Government filed a *Notice Regarding Forfeiture* stating that both financial accounts related to the two forfeiture charges in the Indictment have been disposed of through an administrative forfeiture process and therefore there was no need for a bifurcated forfeiture hearing at trial.

On January 23, 2026, the Government filed a motion to amend the Indictment with a version that renumbers the counts, banks, and victims to account for the dismissal of two counts relating to former Victim 3.  (R. 43: Motion to Permit Submission of Amended Indictment; PageID 243).  The Court granted that motion at the final pretrial conference on January 26, 2026. With the Amended Indictment and for the Court's benefit as the testimony comes in, here is a key to the banks and victims listed by number in the Amended Indictment:

| | | | |
|---|---|---|---|
| Victim 1: | Beverly G█████ | Bank 1 | Key Bank |
| Victim 2: | Helen H█████ | Bank 2 | Charles Schwab Bank |
| Victim 3: | Rose R███ | Bank 3 | Barclays |
| Victim 4: | Alice P█████ | Bank 4 | Citibank |

### III.  ELEMENTS OF THE OFFENSES

The Amended Indictment charges Defendant with three types of offenses.

### A.  Counts 1–10 (Bank Fraud)

The elements of Bank Fraud are as follows:

First, that the defendant knowingly executed, or attempted to execute, a scheme to obtain the money, funds or other property owned by or under the control of a financial institution by means of materially false or fraudulent pretenses, representations or promises;

Second, that the scheme to defraud or pretenses, representations, or promises included a material misrepresentation or concealment of a material fact;

Third, that the defendant had the intent to defraud; and

Forth, that the financial institution was then federally insured.

**B.      Counts 11-14 (Aggravated Identity Theft)**

The elements of Aggravated Identity Theft are as follows:

First, that the defendant committed the felony violation of Bank Fraud, 18 U.S.C. § 1344 as charged in the following counts:

       Ct. 11:          Bank Fraud as charged in Count 2;

       Ct. 12:          Bank Fraud as charged in Count 3;

       Ct. 13:          Bank Fraud as charged in Count 6;

       Ct. 14:          Bank Fraud as charged in Count 8;

Second, that that the defendant knowingly transferred, possessed, or used a means of identification of another person without lawful authority;

Third, that defendant knew the means of identification belonged to another person; and

Fourth, that the transfer, possession, or use was during and in relation to a violation of Bank Fraud, Title 18 U.S.C. § 1344.

**C.      Count 15 (Money Laundering)**

The elements of Engaging in Monetary Transaction in Property Derived from Specified Unlawful Activity in violation of Title 18, United States Code, Section 1957 are as follows:

First, that the defendant knowingly engaged in a monetary transaction.

Second, that the monetary transaction was in property derived from specified unlawful activity.

Third, that the property had a value greater than $10,000.

Fourth, that the defendant knew that the transaction was in criminally derived property.

Fifth, that the monetary transaction took place within the United States.

## IV.   ANTICIPATED EVIDENTIARY ISSUES

### A.   Summary Evidence Demonstratives are Themselves Admissible.

The United States has obtained records pertaining to this case, which the government anticipates introducing through various summary witnesses.  To educate the jury and present relevant evidence in an effective and efficient manner, these government witnesses may use summary PowerPoints and charts of this material, which the United States anticipates presenting during their trial testimony.  These summary charts are themselves admissible evidence under Federal Rule of Evidence 1006 and the United States will seek to admit them as substantive evidence, which the jury could reference during deliberations.  Federal Rule of Evidence 1006 permits the use of summary charts by providing that "contents of voluminous writings, recordings, or photographs which cannot conveniently be examined in court may be presented in the form of a chart, summary, or calculation."  The Sixth Circuit has approved the use of summary materials.  *See United States v. Bray*, 139 F.3d 1104, 1112 (6th Cir. 1998).

The summary exhibits will accurately depict the evidence to be presented to the jury and will streamline the trial considerably by condensing the records.  For each summary exhibit that the United States anticipates using at trial, the United States has complied with Rule 1006 by providing the underlying documents to Defendants and/or making them available for examination.  Additionally, the United States will produce all such summaries to Defendant before trial consistent with the Court's trial order.  The United States proposes including the Sixth Circuit Pattern Jury Instruction Section 7.12 and 7.12A, which is in the parties' jointly

proposed jury instructions.

**B.  The Court Should Permit the Presence of the Government's Agent at Trial.**

The United States respectfully requests that the Court issue a witness-sequestration order pursuant to Federal Rule of Evidence 615.  The United States designates FBI Special Agent Alex Baldwin as its representative in this case to be present at counsel table throughout the trial.  The agent's presence in the courtroom during trial is essential to the presentation of the government's case.  *See* FED. R. EVID. 615(b) (specifically excluding from a sequestration order "an officer or employee of a party that is not a natural person, after being designated as the party's representative by its attorney"); FED. R. EVID. 615(c) (providing an additional exception for essential witnesses).

**C.  The Government May Introduce Evidence of Uncharged Executions of the Scheme to Commit Bank Fraud.**

The government may admit evidence of additional executions of a scheme:

It is important to recognize that just as all the overt acts of a conspiracy need not be charged in an indictment, *see United States v. Janati*, 374 F.3d 263, 270 (4th Cir.2004) ("It is well established that when seeking to prove a conspiracy, the government is permitted to present evidence of acts committed in furtherance of the conspiracy even though they are not all specifically described in the indictment"), all executions of a scheme likewise need not be charged, *see United States v. Pless*, 79 F.3d 1217, 1220 (D.C.Cir.1996) ("That the government chose to charge as the execution of the scheme only the three deposits in National [Bank] does not reduce the boundaries of the scheme, which the statute requires the government to prove.... [I]t is not necessary for the government to charge every single act of execution of the scheme in order to prove the whole scheme"). Nonetheless, evidence of transactions and conduct not charged is relevant to proving the existence of and the boundaries of the conspiracy or scheme. *See Janati*, 374 F.3d at 275 ("[T]he government has the right and the burden to prove in its case-in-chief a conspiracy broader than the individual overt acts alleged [and] therefore the district court must give the government a reasonable opportunity to carry this burden"); *Pless*, 79 F.3d at 1220 ("[T]he government is [not] artificially limited to presenting to the jury only that portion of the scheme that directly related to [the charged executions]"). A scheme and a conspiracy thus are, for these purposes, similar concepts. *See United States v. Lothian*, 976 F.2d 1257, 1262 (9th Cir.1992) ("Because an essential element of these offenses

> is a fraudulent scheme, mail and wire fraud are treated like conspiracy in several respects"); *United States v. Read*, 658 F.2d 1225, 1239 (7th Cir.1981) ("A scheme to defraud and conspiracy embrace analogous, but not identical, concepts"); *United States v. O'Connor*, 580 F.2d 38, 41–42 (2d Cir.1978) (equating "a continuing scheme" with a conspiracy); *SEC v. Nat'l Bankers Life Ins. Co.*, 324 F.Supp. 189, 195 (N.D.Tex.1971) (describing "the possibility of reading 'scheme' as synonymous with a conspiracy" in a federal securities statute). We therefore conclude that when the government charges a defendant under § 1347 with a scheme to defraud and elects to charge only some of the executions of that scheme, its election does not limit its proof to only the charged executions. It may introduce other evidence of uncharged executions to prove the scheme.

*United States v. Bajoghli*, 785 F.3d 957, 963 (4th Cir. 2015) (collecting cases and reversing a district court's order limiting the government to proof of the 53 executions of the health care fraud scheme charged in the indictment).

The Government therefore may introduce evidence of additional executions of the scheme to commit bank fraud. These executions relate to additional transactions for Victims 1 – 4 that were not specifically alleged in the Indictment and to executions for other victims.[2]

### D.  Attacks on the Government's Investigation Are Irrelevant.

In the prosecution of Timothy McVeigh, one of the most renowned capital cases presented by the Department of Justice, the Tenth Circuit Court of Appeals determined that the district court properly excluded as irrelevant evidence and questioning designed to impugn the investigation. *United States v. McVeigh*, 153 F.3d 1168 (10th Cir. 1998). McVeigh wanted to introduce evidence that there were alternate perpetrators possibly responsible for the conspiracy to destroy the Murrah building and that the government suspended its independent investigation after McVeigh's arrest and centered only upon him as a suspect. McVeigh argued that a

---

[2]  The Government is mindful of the Court's preliminary ruling granting its motion in limine regarding former Victim 3 from the Indictment (R. 38: Government Motion in Limine; PageID 222), and will not admit evidence of any executions of the scheme regarding that victim.

government cooperator had stated in a proffer that she had gone to Elohim City and met another individual who was a violent opponent of the federal government and had taught her how to prepare napalm and various bomb components.  She also had stated in the proffer that while in Elohim City she met another anti-government group leader and discussed with him the acquisition of bomb components for the purpose of bombing government buildings in either Oklahoma City or Tulsa.  This cooperator had also stated within her proffer that she had met yet another person in Elohim City who specifically told her that he had planned to bomb the Murrah Building 12 years earlier.  Furthermore, this cooperator stated in the proffer that she knew about the affinity that these Elohim City groups had for the people killed in the Waco, Texas, siege and that she had allegedly seen the two brothers at Elohim City that resembled the two individuals depicted in the composite drawings known as "John Doe 1" and "John Doe 2," the original suspects in the bombing.  McVeigh also wanted to introduce that despite this information, the federal investigation into Elohim City was suspended after McVeigh's arrest:

> McVeigh contends that this proffered evidence was relevant to two separate propositions: first, that there were other perpetrators of the bombing, and second, that the government's investigation of the bombing was "shoddy and slanted", with investigators allegedly overlooking exculpatory evidence after they became satisfied that McVeigh was the principal perpetrator.

*Id*. at 1190.

The Tenth Circuit found that the probative value of the proffered evidence was highly generalized and speculative:

> In the face of the speculative probative value of Howe's testimony, we must confront the very real dangers of unfair prejudice and confusion of the issues. It also presented a threat of "unfair prejudice" as it would invite the jury to blame absent, unrepresented individuals and groups for whom there often may be strong underlying emotional responses.

*Id*. at 1191-92.  The Tenth Circuit determined that the prejudicial value outweighed the

12

probative value and held that the district court acted properly in not allowing the evidence.

The Tenth Circuit went on to address the admissibility of the defense argument that the investigation was shoddy and slanted and focused solely on McVeigh.  The Tenth Circuit determined that putting the investigation on trial was irrelevant:

> Under our system of criminal justice, the issue submitted to the jury is whether the accused is guilty or not guilty.  The jury is not asked to render judgment about non-parties, nor is it normally asked to render a verdict on the government's investigation.  The district court did not abuse its discretion, but rather is to be commended, in keeping the focus of the trial upon the issue properly before the jury.

*United States v. McVeigh*, 153 F.3d at 1192.

The Sixth Circuit has followed the same approach.  In *United States v. Veal*, 23 F.3d 985 (6th Cir. 1994), a prosecution of a pharmacist for illegal drug prescriptions, the court upheld a district court's decision to exclude evidence that the Government's investigation had been "sloppy" in its miscalculation of the number of bogus prescriptions.  *Id*. at 989.  It found no abuse of discretion in the district court ruling, based on relevance grounds, that "the jury would not be called upon to determine whether the government's investigation had been good or bad." *Id*.

This is exactly what Defendant Cao wanted to do regarding evidence relating to previously-dismissed counts.  (R. 46: Response to Motion in Limine; PageID 269).  This Court preliminarily ruled that Defendant could not ask such questions, but that ruling appeared to be premised on Evidence Rule 403 grounds, that such an attack in the circumstances Defendant described would be a waste of resources and involve a mini-trial on dismissed counts.  The Government notes its relevance concerns for similar attacks on the investigation that Defendant may mount.

E.     **If the Court Allows the Defense to Question the Conduct of the Investigation, the Government is Allowed to Defend Its Investigation with Evidence that Would Otherwise Normally Be Considered Hearsay.**

If the Court allows the defense to question or attack the investigation, the Government is entitled to defend itself, and that defense may include otherwise inadmissible hearsay. Such evidence will be admissible in this scenario though because it will be offered not for the truth of the matter, but instead to explain *why* FBI SA Baldwin did what she is being attacked for doing:

> Hearsay is defined as an out-of-court statement "offered in evidence to prove the truth of the matter asserted." Fed. R. Evid. 801(c). The record reveals that the challenged testimony was elicited in an effort to explain the basis for the FBI's decision to pursue the investigation of the defendant, and not to prove the truth of the matter asserted – i.e., that Khalil was actually engaged in narcotics trafficking in 1997 and 1998. If properly admitted for this purpose, Agent Moran's testimony was not hearsay. *See United States v. Pulley*, 922 F.2d 1283, 1288 (6th Cir.), *cert. denied*, 502 U.S. 815, 116 L. Ed. 2d 42, 112 S. Ct. 67 (1991) ("[out-of-court statement made to investigating agent] was offered to prove that [the agent] had good reason to continue his search of the house, it was not hearsay."). Although this testimony is still subject to exclusion if its unfair prejudicial effect outweighs its probative value, Fed. R. Evid. 403, we conclude that the defendant "opened the door" to such testimony by placing Agent Moran's state of mind directly at issue. *See Pulley*, 922 F.2d at 1288 (holding that out-of-court statements were properly admitted to show customs agent's state of mind where defendant suggested that agent planted drugs during a search); *see also United States v. Segines*, 17 F.3d 847, 856 (6th Cir. 1994) ("When one party has 'opened the door' on an issue, by eliciting prejudicial or inadmissible testimony, an opponent, in the court's discretion, [may] introduce evidence on the same issue to rebut any false impression that might have resulted from the earlier admission." (internal quotation marks and citations omitted)). By suggesting that the government improperly targeted him due to his position in the Avengers and then ultimately entrapped him when it could not uncover legitimate evidence, the defendant invited rebuttal testimony from the government to explain why it proceeded with the investigation in the manner that it did. Agent Moran's testimony was therefore properly admitted as relevant nonhearsay testimony.

*United States v. Khalil*, 279 F.3d 358, 364 (6th Cir. 2002).

Thus, if Defendant questions or elicits testimony attacking the Government's investigation, that will open the door to the Government's defense of its investigation with otherwise inadmissible hearsay, including hearsay statements from other victims and witnesses.

### F.      Defendants' Self-Serving Exculpatory Statements Are Not Admissible.

In its case-in-chief, the government intends to offer certain statements that Defendant made as admissions of a party opponent.  Defendant, however, should be prohibited from offering self-serving exculpatory statements in return.  "[S]elf-inculpatory statements, when offered by the government, are admissions by a party-opponent and are not therefore hearsay, see Fed. R. Evid. 801(d)(2), but the non-self-inculpatory statements are inadmissible hearsay." *United States v. Ortega*, 203 F.3d 675, 682 (9th Cir. 2000); *see also United States v. McDaniel*, 398 F.3d 540, 545 (6th Cir. 2005) (citing *United States v. Wilkerson*, 84 F.3d 692, 696 (4th Cir. 1996), *cert. denied*, 522 U.S. 934 (1997)).  While the Federal Rules of Evidence allow the government to introduce inculpatory statements made by a defendant, the "Rules do not, however, provide an exception for self-serving, exculpatory statements made by a party which are being sought for admission by that same party."  *McDaniel*, 398 F.3d at 545.  Thus, while the government is permitted to introduce some or all of a defendant's statements against her as non-hearsay admissions of a party-opponent under Rule 801(d)(2), a defendant is not permitted to introduce her own statements under the same Rule.  Indeed, if exculpatory statements were admitted at trial, a defendant would be able "to place [her] exculpatory statements 'before the jury without subjecting [herself] to cross-examination, precisely what the hearsay rule forbids.'" *Ortega*, 203 F.3d at 682 (quoting *United States v. Fernandez*, 839 F.2d 639, 640 (9th Cir. 1998)).

This rule applies equally to the evidence the defendant seeks to introduce in his own case as it does to the evidence he tries to elicit through the cross-examination of witnesses.  Because the government may be introducing portions of the defendant's statements—through an audio recording, written statements, and testimony of witnesses—it anticipates that the defendant may seek to have some additional portions of the statements entered into evidence pursuant to Rule

106.  The "rule of completeness" allows a party to introduce other parts of a written or oral statement that ought in fairness to be introduced to place the part of the statement introduced by the other party in context.  *United States v. Gallagher*, 57 F. App'x 622, 628 (6th Cir. 2003).  But this rule does not allow a defendant to introduce other self-serving statements form the same interview: "As this circuit has observed, 'the completeness doctrine embodied in Rule 106 should not be used to make something admissible that would otherwise be excluded.'"  *Id*. at 628-29 (quoting *Trepel v. Roadway Express, Inc.*, 194 F.3d 708, 718 (6th Cir. 1999)); *see also United States v. Costner*, 684 F.2d 370, 373 (6th Cir. 1982).

### G.       WHOIS Data is Admissible Under Federal Rule of Evidence 803(17).

As we explained in our opposition to Defendant's Consolidated Motion in Limine, the Government expects to elicit testimony from several witnesses about IP addresses.  (R. 47: Opposition to Defendant's Motion in Limine; PageID 276-81).  And there will be further testimony that the IP addresses logged by several companies traced back to different entities. (*Id*.).  More specifically, SA Baldwin will explain that she used a WHOIS tool that queries a public database of registrants of, among other identifiers, IP addresses, in order to identify the provider of the relevant IP addresses.  The WHOIS database results fit within a hearsay exception.

The underlying contents of WHOIS databases satisfy the requirements of Rule 803(17) excepting from hearsay market quotations, lists, directories, or other compilations that are generally relied on by the public or by persons in particular occupations, *see EarthLink, Inc. v. Ahdoot*, No. 1:03-CV-2559-JOF, 2005 WL 8154298, at *8 (N.D. Ga. Feb. 1, 2005). *See also Columbia Ins. Co. v. seescandy.com*, 185 F.R.D. 573, 576 (N.D. Cal. 1999) ("The ownership information for any given domain name can be looked up in a public database using a 'WHOIS'

16

query."); *Dish Network L.L.C. v. Fraifer*, No. 8:16-CV-2549-TPB-CPT, 2023 WL 8622142, at *9 (M.D. Fla. Aug. 31, 2023), *report and recommendation adopted*, No. 8:16-CV-2549-TPB-CPT, 2024 WL 51035 (M.D. Fla. Jan. 4, 2024) ("WHOIS documents fell within the ambit of [Rule 803(17)], insofar they were of the kind regularly relied upon to establish the identity of registrants").  WHOIS databases are analogous to vehicle identification number databases, *United States v. Woods*, 321 F.3d 361, 362 (3d Cir. 2003), and bank routing number origin databases, *United States v. Goudy*, 792 F.2d 664, 675 (7th Cir. 1986), both of which have been found to satisfy Evidence Rule 803(17).

### H.    Use of FBI Interview Reports

Interview summaries prepared by agents with the Federal Bureau of Investigation (known as "FBI 302s") are not statements of the person interviewed under the *Jencks Act*.  The defense therefore should not be allowed to introduce the contents of the FBI 302s to impeach witnesses during cross examination, or to suggest to the jury that the 302s are statements of individuals who neither wrote nor adopted them, or to bolster or act as a stanchion for the opinions of its expert witness.[3]

---

[3]    Defendant retained an expert whose report indicates that he reviewed all of the Government discovery, which includes FBI 302's.  An expert's reliance on third party statements summarized in an FBI 302 may constitute double hearsay. In such circumstances, Courts

> must serve a gate-keeping function with respect to Rule 703 opinions to ensure "the expert isn't being used as a vehicle for circumventing the rules of evidence." *In re James Wilson Assocs*., 965 F.2d 160, 173 (7th Cir. 1992). Rule 703 "was not intended to abolish the hearsay rule and to allow a witness, under the guise of giving expert testimony, to in effect become the mouthpiece of the witnesses on whose statements or opinions the expert purports to base his opinion." *Loeffel Steel Prods., Inc. v. Delta Brands, Inc.*, 387 F.Supp.2d 794, 808 (N.D. Ill. 2005). The rule "was never intended to allow oblique evasions of the hearsay rule." *Id.*

*Tubular Roller, LLC et al v. Maximus Oilfield Products* LLC, 2021 WL 5991744, *2 (S.D. Tex. 2021) (quoting *Factory Mut. Ins. Co. v. Alon USA L.P.,* 705 F.3d 518, 523–24 (5th Cir. 2013)).

1. <u>FBI 302s Are Not Statements of the Individual Interviewed Under the Jencks Act</u>

In order to provide for full and fair cross-examination, the *Jencks Act* requires that after a witness for the United States testifies on direct examination, the United States must provide the defense with any statements made by the witness that relates to the subject of his or her testimony. 18 U.S.C. § 3500. A statement within the meaning of the *Jencks Act* is defined as "a written statement made by said witness and signed or otherwise adopted and approved by him;" a recording or transcription that "is a substantially verbatim recital of an oral statement made by said witness and recorded contemporaneously;" or a statement made by a witness to the grand jury. 18 U.S.C. § 3500(e).

In *Palermo v. United States*, the Supreme Court held that because the *Jencks Act* is meant to restrict the defense's use of discoverable statements to impeachment, 360 U.S. 343, 349 (1959), "only those statements which could properly be called the witness' own words should be made available to the defense." *Id.* at 352. The Court went on to elaborate that "summaries of an oral statement which evidence substantial selection of material" or "statements which contain [an] agent's interpretations or impressions" are "not to be produced." *Id.* at 352-53.

Consistent with *Palermo*, FBI 302s are not discoverable under the *Jencks Act* because they are not statements of the interviewees within the meaning of the statute.[4] Unless the interviewees have reviewed and adopted the FBI 302s -- which is not the practice in this case -- the 302s are not statements of the interviewees under subsection (e)(1) of the *Jencks Act*. Moreover, because the 302s are written after interviews were completed and reflect the thought

---

[4]     Of course, the United States concedes that an FBI 302 would be discoverable under the *Jencks Act* as a statement of the agent/analyst who authored the FBI 302, if the agent/analyst-author is called as a witness to testify regarding the subject matter contained in the report.

processes and interpretations of the agent, they do not constitute a contemporary and substantially verbatim recital of the interviewees' statements under subsection (e)(2).

Every circuit court to address the question has held that FBI 302s generally are not discoverable under the *Jencks Act*. *United States v. Price*, 542 F.3d 617, 621 (8th Cir. 2008) (holding that absent evidence that the testifying interviewees "approved or adopted" the FBI 302s, "these documents are not discoverable under . . . the *Jencks Act*"); *United States v. Jordan*, 316 F.3d 1215, 1255 (11th Cir. 2003) (holding that FBI 302s "are not *Jencks Act* statements of the witness unless they are substantially verbatim and were contemporaneously recorded, or were signed or otherwise ratified by the witness"); *United States v. Donato*, 99 F.3d 426, 433 (D.C. Cir. 1996) ("[T]he agent's notes and 302 report . . . are not covered by the Jencks Act."); *United States v. Roseboro,* 87 F.3d 642, 646 (4th Cir. 1996) ("[T]he district court's finding that the FBI 302 Report was not a *Jencks Act* statement is not clearly erroneous."); *United States v. Farley*, 2 F.3d 645, 654-55 (6th Cir. 1993) (holding that because there was "no proof that the statement was adopted or approved . . . it was not clearly erroneous . . . to deny defendants access to the FBI 302"); *United States v. Williams*, 998 F.2d 258, 269 (5th Cir. 1993) ("We hold that the FBI Forms 302 were not discoverable statements under the *Jencks Act.*"); *United States v. Morris*, 957 F.2d 1391, 1402 (7th Cir. 1992) ("[T]he documents are not statements producible under the *Jencks Act* because they were neither signed nor adopted . . . and further because they are not a verbatim recital . . . but rather only an agent's summary."); *United States v. Foley*, 871 F.2d 235, 239 (1st Cir. 1989) ("It is plain that the 302s are not substantially verbatim recitals . . . and recorded contemporaneously."); *United States v. Claiborne*, 765 F.2d 784, 801 (9th Cir. 1985) (because "the summaries represent . . . the agents' selection of certain information . . . the district court properly characterized the summaries as non-*Jencks Act* material").

2.  Proper Use of FBI 302s at Trial

In the instant case, the United States has provided broad discovery, including producing all of the FBI 302s, regardless of whether the agent/analyst author or the interviewee is expected to testify.  In this circumstance, the defense should be limited to using those FBI 302s consistent with the law and rules of evidence.  In particular, the defense must be precluded from introducing the contents of the FBI 302s to impeach witnesses on the basis of inconsistent statements because the FBI 302s are not the statements of the witnesses themselves.  Moreover, they must be precluded from publishing the contents of the FBI 302s to the jury, or otherwise suggesting to the jury that the FBI 302 is a statement of the witness. To allow otherwise would subvert the meaning of the *Jencks Act* and the Supreme Court's decision in *Palermo* holding that it would "be grossly unfair to allow the defense to use statements to impeach a witness which could not fairly be said to be the witness' own rather than the product of the investigator's selections, interpretations and interpolations."  360 U.S. at 350.  The defense is, of course, free to ask a witness whether he or she made a statement that is reflected in an FBI 302.[5]  However, if the defense is not satisfied with the witness's answer, the defense may not publish or introduce the contents of the 302 as a prior inconsistent statement.  *See United States v. Brika*, 416 F.3d 514, 529 (6th Cir. 2005) (holding that "such documents [FBI 302s] have been deemed inadmissible for impeaching witnesses on cross-examination"); *United States v. Leonardi*, 623 F.2d 746, 757 (2d Cir. 1980) (holding that because "the written statement of the FBI agent was not attributable to [the witness]" it was "properly rejected as a prior inconsistent statement");

---

[5]  Likewise, in the appropriate circumstances and with the proper foundation, the defense may attempt to refresh the witness's recollection by showing the witness the 302, but only if the defense does so in a manner that does not imply that the 302 is the witness's own statement.

*United States v. Hill*, 526 F.2d 1019, 1026 (10th Cir. 1975) (upholding the trial court's decision to "not allow counsel to use the 302 statement to impeach a witness because the witness did not prepare or sign the document and probably never adopted it").  Moreover, the defense may not use the 302 in a way that suggests to the jury that the 302 is a statement of the witness.  *See United States v. Marks*, 816 F.2d 1207, 1210-11 (7th Cir. 1987) (holding that where defense counsel read from a 302 during cross-examination in a way that would "seem authoritative" and potentially confuse the jury, the judge was entitled to require the witness be shown the 302 and given the opportunity to adopt or reject it as a statement, although such a practice was no longer required by the federal rules of evidence).

### I.  References to Consequences of Guilty Verdict

Fed. R. Evid. 401, 402, and 403, preclude testimony, evidence, and argument about the potential penalties associated with a conviction in this case.  In a federal criminal prosecution, the jury's sole function is to determine guilt or innocence.  Evidence regarding punishment or the effects of conviction is thus irrelevant and inadmissible before the jury.  The punishment provided by law upon conviction of a criminal violation is a matter exclusively within the province of the Court and should never be considered by the jury in any manner in arriving at its verdict as to guilt or innocence. *United States v. Bilderbeck,* 163 F.3d 971, 978 (6th Cir. 1999).

The Supreme Court has opined that:

> [t]he principle that juries are not to consider the consequences of their verdicts is a reflection of the basic division of labor between the judge as sentencer and the jury as trier of fact. Providing jurors sentencing information invites them to ponder matters that are not within their province, distracts them from their responsibilities, and creates a strong possibility of confusion.

*Shannon v. United States*, 512 U.S. 573 (1994).

The United States anticipates this Honorable Court will instruct the jury that:

a.       its job is to "consider only the evidence in the case," to apply the law to the facts, and to not "let any bias, sympathy or prejudice that you may feel toward one side or the other influence your decision in any way." (Sixth Circuit Pattern Criminal Jury Instructions, 2024 Edition, Sections 1.02, and 1.05); and

b.       "Deciding what the punishment should be is my job, not yours. It would violate your oaths as jurors to even consider the possible punishment in deciding your verdict." (Sixth Circuit Pattern Criminal Jury Instructions, 2024 Edition, Section 8.05).

The authorities are unequivocal in holding that presenting information to the jury about potential punishment associated with a conviction is prejudicial. Breach of this standard has often been grounds for reversal. A jury is obligated to "reach its verdict without regard to what sentence might be imposed." *Rogers v. United States*, 422 U.S. 35, 40 (1975). Absent a statutory requirement that the jury participate in the sentencing decision, nothing is left "for jury determination beyond the guilt or innocence of an accused." *United States v. Frank*, 956 F.2d 872, 879 (9th Cir. 1992), citing *United States v. McCracken*, 488 F.2d 406, 423 (5th Cir. 1974) and *United States v. Davidson*, 367 F.2d 60, 63 (6th Cir. 1966).

Evidence that relates to the issue of punishment upon conviction of a criminal offense has no bearing on the only question the jury in this case will be called upon to decide—that of the guilt or innocence of the defendant. Evidence dealing with the consequences of conviction—including mandatory prison time and deportation from the country—is not probative of the issue of guilt or innocence. Since such evidence would not tend to prove or disprove any fact of consequence to the jury's determination of guilt or innocence, such evidence is not "relevant," as that term is defined by Fed. R. Evid. 401 and should therefore be excluded Fed. R. Evid. 402.

## V. CONCLUSION

The United States is prepared to submit additional briefing on any issue should the Court or circumstances require.

<div style="margin-left: 40%;">

Respectfully submitted,

DAVID M. TOEPFER
United States Attorney

By:   /s/ Michael L. Collyer
         Edward D. Brydle (OH: 0083243)
         Assistant United States Attorney
         Michael L. Collyer (OH: 0061719)
         Assistant United States Attorney
         801 West Superior Avenue, Suite 400
         Cleveland, OH 44113
         (216) 622-3875
         (216) 522-2403 (facsimile)
         Edward.Brydle@usdoj.gov
         Michael.Collyer@usdoj.gov

</div>