IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | CASE NO.: 1:24-CR-00151 |
| | ) | |
| Plaintiff, | ) | JUDGE J. PHILIP CALABRESE |
| | ) | |
| v. | ) | |
| | ) | |
| YUE CAO, | ) | <u>SENTENCING MEMORANDUM</u> |
| | ) | |
| Defendant. | ) | |

Now comes the United States of America, by and through its counsel, David. M. Toepfer, United States Attorney, and Edward Brydle and Michael L. Collyer, Assistant United States Attorneys, and hereby submits this memorandum to aid the Court in its sentencing of Defendant Yue Cao, a bank employee tasked with protecting customers from would-be criminals but became one himself after executing a sophisticated scheme to steal directly from the accounts of vulnerable customers. The United States seeks a prison sentence at the high-end of the guidelines range.

## I. BACKGROUND

The evidence at trial established the following set of facts. Defendant was employed by Key Bank as a quant analytics manager beginning approximately June 22, 2015. Defendant's work centered around building models for the bank designed to detect, and prevent, financial crimes such as fraud and money laundering. In order to conduct his work, Defendant was given broad access to substantial customer and client information, including account information. Defendant was a fully remote employee who worked from his residence. Defendant left his position at Key Bank on or about June 24, 2022, and was hired at Charles Schwab shortly thereafter. At Charles Schwab, Defendant was doing similar work–building models for internal systems designed to predict and track fraud.

In April 2023, Charles Schwab's internal systems identified a previous transfer of approximately $50,000 from B.G.'s bank account at Key Bank into Defendant's Charles Schwab checking account. Charles Schwab personnel reviewed Defendant's accounts and identified the following series of transactions between B.G.'s account at Key Bank and Defendant's accounts at Charles Schwab:

| Approximate Date | Amount | Originating Account | Receiving Account |
|---|---|---|---|
| January 4, 2023 | $100 | B.G.'s Key Bank savings | Defendant's Charles Schwab checking |
| January 6, 2023 | $5,000 | B.G.'s Key Bank savings | Defendant's Charles Schwab checking |
| January 27, 2023 | $5,100 | Defendant's Charles Schwab checking | Defendant's Charles Schwab brokerage |
| February 6, 2023 | $50,000 | B.G.'s Key Bank savings | Defendant's Charles Schwab checking |
| February 9, 2023 | $50,100 | Defendant's Charles Schwab checking | Defendant's Charles Schwab brokerage |

In March 2023, after being contacted by Key Bank, B.G. (age 103) told Key Bank employees that she did not enroll in online banking, did not authorize the above-listed online transactions, did not authorize the online transaction that liquidated her investment account in October 2022, and did not attempt an online purchase of 900 shares of stock through her investment account in March 2023. As a result, the online request for 900 shares was cancelled by Key Bank investment advisors and an investigation was launched.

Charles Schwab investigators identified email notifications it sent to Defendant's personal email address related to linking B.G.'s Key Bank savings account to Defendant's Charles Schwab checking account. Once the unauthorized transfers were deposited into Defendant's Charles Schwab brokerage account (which had an account balance of zero before the first unauthorized deposit), Defendant began immediately trading within his brokerage account and received hundreds of notifications to his email and phone related to the trading that occurred over the

following months.

On April 17, 2023, Defendant attempted to link three additional Key Bank customer accounts to his Charles Schwab brokerage account (Gov't. Ex. 301)[1]. At this point, Charles Schwab had switched to a new internal software system for monitoring account linkages to external banks. The system captured Defendant's attempts but denied the linkage as Defendant's social security number ("SSN") did not match the Key Bank victims' SSNs. At least two of the attempted account links occurred from Defendant's home residential internet protocol ("IP") address. After an internal review of this activity by Charles Schwab, Defendant's logins from his personal cell phone were consistent for several months prior to the unauthorized transfer, throughout the unauthorized transfers, and after the transfers. This information, along with a lack of any other suspicious Schwab logins, confirmed what was obvious from the deposits and trading patterns–Defendant was responsible for the unauthorized deposits.

Defendant was interviewed by Charles Schwab on April 18, 2023, and April 20, 2023, related to this activity, and each time denied any wrongdoing, claiming he was unaware of the unauthorized banking activity in his accounts–something Schwab considered nearly impossible with all the evidence to the contrary. Defendant was fired from Charles Schwab on April 20, 2023. Five days later, Defendant filed a complaint with the Federal Bureau of Investigation ("FBI") Internet Crimes Complaint Center claiming his accounts and/or internet router had been hacked, thus portraying himself as a victim.

Charles Schwab notified Key Bank, Defendant's previous employer, of the unauthorized activity involving their customers. Key Bank conducted an internal investigation into

[1] J.R. was identified as the owner of the Key Bank account that Cao attempted to link his Charles Schawb brokerage account at 14:21 and 14:18 on April 17, 2023. The other two Key Bank account holders were B.S. and H.H.

Defendant's activity during the period Defendant was employed with Key Bank. Key Bank identified several unauthorized online banking accounts believed to be opened by Defendant using the personal identifying information of very elderly customers of Key Bank. Other targeted Key Bank accounts had not yet enrolled in online banking–a feature that Key Bank offered its customers. The investigation revealed Defendant enrolled several of these customers in online banking, thereby giving him full control of these victims' bank accounts. A similar email address naming convention was used for each of the Key Bank online banking accounts opened. The email addresses used to open the unauthorized accounts typically began with the victim's first name or initial, then last name, then year of birth, and contained the same domain name.[2]

The investigation also identified several instances of money transfers between the Key Bank customer accounts and the unauthorized Key Bank accounts opened in their name. However, in other instances, Defendant transferred money from Key Bank customer accounts to accounts at other financial institutions. The accounts at the other financial institutions receiving the unauthorized transfers were (1) unauthorized accounts opened using the victims' identities, and (2) Defendant's own personal accounts. Key Bank worked with other financial institutions to claw back as many of the unauthorized transactions it could. Key Bank also notified law enforcement of its investigation.

After receiving the complaint from Key Bank, the FBI conducted its own investigation. This investigation eventually focused on the unauthorized transfers, and attempted transfers, from Key Bank accounts to other financial institutions. FBI developed several other pieces of evidence that implicated Defendant in the scheme including: unauthorized victim accounts opened at

[2] The evidence revealed that Special Agent Baldwin attempted to obtain information from the email provider associated with this domain, a company based in Germany, but the provider does not maintain subscriber data for inactive accounts and the email accounts at issue were inactive by the time she contacted the provider. Attempts to request any available account information via international partners were unsuccessful due to privacy laws.

financial institutions where Defendant also had a personal account, evidence of account linkages (and linkage attempts) with Defendant's personal accounts, multiple credit card payments on Defendant's personal account from a victim's account at Key Bank, and multiple unauthorized transfers of money from victims' account at Key Bank to Defendant's personal checking and brokerage accounts.

In April 2024, a search warrant was executed on Defendant's personal email address. Located within his messages were a series of emails from the United States Postal Services (USPS) Informed Delivery service—a service that allowed Defendant to preview images of incoming mail. Several emails from July through December 2022 from USPS Informed Delivery contained images of envelopes from Bluebird that were American Express prepaid debit cards. Incomm Financial Services, Inc., who manages the program and is the records custodian associated with the Bluebird accounts, testified that the prepaid cards were ordered online in the names of four Key Bank customers, including three of the four named victims. Once approved, Defendant changed the address on the account and had new pre-paid cards sent to his home address. Once he received the pre-paid cards to his home address, Defendant activated the cards using the pre-paid card numbers and then changed the address of the account back to the victims' addresses. According to the testimony of the Incomm investigator, this was a scheme indicative of fraud.

Additionally, brokerage accounts at Tastytrade, a popular brokerage for options traders, were opened in the name of two of the Key Bank victims around the same time Defendant opened his own account. During four days in 2022, one of the victim accounts and Defendant's account traded options between each other—activity that was indicative of moving funds between accounts. Eventually, a few weeks after the account was opened, Tastytrade returned $30,000 in

previously deposited funds to the victim's Key Bank account and took a loss of $7,215.09.

## II. APPLICABLE LEGAL STANDARDS

To determine the appropriate sentence for a defendant, a court must consider the applicable guidelines range under 18 U.S.C § 3553(a). *United States v. Thompson*, 515 F.3d 556, 560 (6th Cir. 2008). Though the guidelines are advisory now, they are still a "starting point and initial benchmark." *Gall v. United States*, 552 U.S. 38, 39 (2007). Accordingly, a court must "impose a sentence sufficient, but not greater than necessary, to comply with the purposes" outlined in 18 U.S.C. § 3553(a)(2). 18 U.S.C. § 3553(a). These purposes are: (1) the nature and circumstances of the offense and the history and characteristics of the defendant; (2) the need for the sentence imposed including the seriousness of the conduct and the danger the defendant poses to the public; (3) the sentences available; (4) the types of sentences, and the sentencing range established by the Sentencing Commission; (5) any relevant policy statement issued by the Sentencing Commission; (6) "the need to avoid unwarranted sentence disparities; and (7) the need to provide restitution to any victims of the offense." 18 U.S.C. § 3553(a).

## III. SENTENCING GUIDELINES COMPUTATION

The base offense level for 18 U.S.C. § 1344, Bank Fraud, is 7. (Final PSR at ¶ 30). Pursuant to U.S.S.G. 2B1.1(b)(1)(I), Defendant's loss range of more than $1,500,000 to no more than $3,500,000 increases the offense score by 16 levels. (*Id*. at ¶ 31). Pursuant to U.S.S.G. 2B1.1(b)(2)(A)(i), there were at least 10 victims, which increases the offense score by two levels. (*Id*. at ¶ 32). Pursuant to U.S.S.G. §3A1.1(b)(1), Defendant knew the victims were vulnerable due to their advanced age, which increases the offense score by 2 levels. (*Id*. at ¶ 33). Pursuant to U.S.S.G. §3B1.3, Defendant abused a position of trust or used a special skill that significantly facilitated the offense, which increases the offense score by 2 levels. (*Id*. at ¶ 34). Pursuant to

U.S.S.G. §3C1.1, the defendant willfully obstructed or impeded, or attempted to obstructed or impeded, the administration of justice by filing a fraudulent complaint, which increases the offense score by another 2 levels. (*Id*. at ¶ 35).

Additionally, although not identified in the PSR and not objected to by the government, the offenses involved sophisticated means, pursuant to U.S.S.G. §2B1.1(b)(10)(C), and the defendant intentionally engaged in or caused the conduct constituting sophisticated means, which increases the offense score by 2 levels. The total offense level found in the PSR is 31, but the government is advocating for a total offense level of 33 with the inclusion of the sophisticated means offenses characteristic. (*Id*. at ¶ 36).

Related to counts 11-13, Aggravated Identity Fraud, a mandatory 24-month term of imprisonment must be imposed consecutively to any other term of imprisonment. (*Id*. at ¶¶ 37-40). The PSR has calculated one criminal history point for Defendant. (*Id*. at ¶ 52). Defendant is a Criminal History Category I with a total offense level of 31 according to the PSR. With that score, Defendant is facing a Zone D Guidelines sentence of 108-135 months of incarceration.[3] Combined with the 24-month mandatory sentence related to the Aggravated Identity Fraud counts, Defendant is facing a total Zone D Guideline sentence of 132-159 months of incarceration. In this case, a Guidelines sentence at the high end meets the requirements for a sentence that is sufficient, but not greater than necessary, to comply with the purposes of the § 3553(a) factors.

[3] If the total offense level is 33, Defendant is facing a Zone D Guidelines sentence of 135-168 months of incarceration. Combined with the 24-month mandatory sentence related to the Aggravated Identity Fraud counts, Defendant would be facing a total Zone D Guideline sentence of 159-192 months of incarceration.

## IV. ARGUMENT

### A. Defendant's Objections to the Presentence Investigation Report

#### 1. Defendant's Loss Calculation Exceeds $1,500,000

Pursuant to U.S.S.G. § 2B1.1, Application Note 3, the loss calculation does not need to be determined with precision and the Court "need only make a reasonable estimate of the loss, given the available information." Defendant enrolled the victims in online banking, took over their accounts, and conducted multiple transactions with the victims' funds totaling approximately $2,043,696.45, which the PSR concludes is the intended loss amount. (Final PSR at ¶¶ 20, 31). Of this amount, approximately $841,184.18 was transferred from the victims' accounts to accounts outside Key Bank, such as Charles Schwab, Barclays, or Tastytrade, which were exclusively controlled by the Defendant. (*Id*. at ¶ 21).

A secondary calculation of intended loss conducted by the Government that focused on avoiding counting subsequent transfers of funds already previously counted likewise leads to an intended loss amount of over $1,500,000 as described below:

| Victim | Amount |
|---|---|
| B.G. | $247,889.13[4] |
| H.H. | $876,988.30 |
| R.R. | $154,379.22 |
| A.P. | $30,000.00 |
| B.S. | $0.18 |
| J.M. | $67,959.49 |
| I.H. | $100,000.00 |
| C.R. | $2.08 |

[4] This figure represents Defendant's liquidation of B.G.'s stock positions within her investment account on October 3, 2022.

| | |
|---|---|
| S.Z. | $290,738.81 |
| **TOTAL** | **$1,767,957.21** |

As demonstrated by his attempts to enroll dozens of elderly customers' accounts in online banking, there is no telling what the actual intended loss figure should be. The reasonable loss calculations in the PSR and above calculation are the best attempts to capture the intended loss. Most importantly, either calculation results in a loss over $1,500,000 and under $3,500,000 resulting in an increase of +16 pursuant to U.S.S.G. §2B1(b)(1)(I).

Lastly, Defendant argues the Court should not consider the $290,738.81 Defendant transferred out of S.Z.'s Key Bank account because the Court granted the government's motion in limine thereby excluding S.Z.'s transactions from the trial. Now that Cao has been found guilty of the scheme to defraud, the Court should consider all transactions that fell under Defendant's scheme to defraud, including those involving S.Z. who was, in fact, one of Defendant's victims. After all, S.Z. was enrolled in online banking on May 4, 2022, during the same mass online enrollment session as several other victims, including A.P., H.H., J.M., and S.Z. The email addresses used to enroll S.Z. began with S.Z.'s first name, then last name, then year of birth, and contained the same domain name as the other unauthorized accounts–GMX.com. Nine days after enrollment, an unauthorized brokerage account was opened in S.Z.'s name at Charles Schwab and correspondence was set to be delivered to the same email account used to enroll S.Z. in online banking at Bank 1. On May 17 and 18, 2022, two unauthorized deposits for $100,000 each were made into the unauthorized brokerage account at Charles Schwab in S.Z.'s name from his Key Bank savings account. The next day, on May 19, 2022, a third unauthorized deposit of $90,738.45 was made into the unauthorized brokerage account at Charles Schwab from S.Z.'s Key Bank account. After receiving mail correspondence from Bank 2 about the opening of the brokerage

account, S.Z. notified employees at a local Key Bank branch that he had not opened this Charles Schwab brokerage account, and the transactions were later reversed.

The evidence establishes S.Z. was another one of Cao's victims. Desperate for a foothold, Defendant argues that S.Z. is not a victim because he made waffling statements on whether indeed he was, or was not, responsible for a July 19, 2022, transfer of $100,000 to another bank. This argument fails and should not prevent this Court from acknowledging S.Z., who passed away during the pendency of this case, as a victim and assigning a loss associated with the three transactions Defendant conducted totaling $290,738.45 into an account the Defendant controlled. But for S.Z.'s complaints to Key Bank, these transactions would likely never have been flagged, and Defendant would have maintained control over the funds. As S.Z. was a victim of Defendant's scheme to defraud, the $290,738.45 should be included in Defendant's loss calculation.

2. <u>The Offense Involved 10 or More Victims</u>

Defendant's fraudulent conduct led to dozens of victims. Although the PSR identified 10 named victims, its offense conduct section identifies more customers whose identities were used by Defendant during his scheme. (Final PSR at ¶¶ 10-14). On May 4, 2022, Defendant enrolled, or attempted to enroll, at least 17 customers in online banking, which included 4 of the 10 named victims (A.P., H.H., J.M., and S.Z), bringing Defendant's total victim count to at least 23 despite evidence there were more. *Id*.

Defendant argues that since some of the victims suffered no actual loss, those victims should not be counted as victims pursuant to U.S.S.G. §2B1.1(b)(2)(A)(i). The Sentencing Commission clearly accounted for a scenario where, as here, certain victims did not suffer actual harm yet their means of identification were used during the commission of an offense. As the PSR correctly points out, U.S.S.G. §2B1.1, Application Note 4(E) states:

> **Cases Involving Means of Identification**.—For purposes of subsection (b)(2), in a case involving means of identification "***victim***" means (i) any victim as defined in Application Note 1; or (ii) any individual whose means of identification was used unlawfully or without authority.

To qualify as a victim pursuant to U.S.S.G. §2B1.1, Application Note 1, the victim must have sustained any part of the actual loss determined under subsection (b)(1) or sustained bodily injury. Although many of the victims qualify under this subsection as they suffered an actual loss, all the victims qualify as a victim under U.S.S.G. §2B1.1, Application Note 4(E)(ii), as their means of identification were used unlawfully and without authority. This application note is unambiguous.

Citing *United States v. Yagar*, 404 F.3d 967, 970 (6th Cir. 2005), Defendant argues that because some of the victims' losses were temporary, they cannot qualify as victims pursuant to U.S.S.G. §2B1.1(b)(2)(A)(i). But "*Yagar* predates the new definition of 'victim' adopted in 2009 for identity-theft cases, making that holding irrelevant." *United States v. Finley*, 600 F.App'x 964, 969 (6th Cir. 2015), citing *United States v. Tragas*, 727 F.3d 610, 620 (6th Cir. 2013). The current definition above makes clear that all the victims in this case should be counted as victims for purposes of the 2-level enhancement pursuant to U.S.S.G. §2B1.1(b)(2)(A)(i).

3. <u>Defendant Abused a Position of Trust and Used a Special Skill</u>

The PSR correctly included an adjustment for role in the offense under U.S.S.G. §3B1.3 as Defendant held, and abused, a position of trust or alternatively used a special skill in a manner that significantly facilitated the commission or concealment of the offense. Pursuant to U.S.S.G. §3B1.3, Application Note 4, "special skill refers to a skill not possessed by members of the general public and usually requiring substantial education, training or licensing." Defendant was a certified money laundering specialist with extensive education and training in programming, modeling, and data mining. (Gov't. Ex. 828). He was tasked with creating models that would protect the bank's customers from fraud. Due to his position, he had extensive access to customer

data including names, customer profiles, account numbers, and account balances. Using his access and his extensive expertise, Defendant was able to identify a group of bank customers in their 90s or 100s who had high account balances that had not yet enrolled in online banking. After identifying this group, he repeatedly attempted to enroll the customers in online banking so he could control their accounts all while using virtual private networks (VPNs) and fraudulent email addresses opened at a foreign-based email provider. In doing so, Defendant used these skills, in a manner that significantly facilitated the commission or concealment of the offense. An ordinary bank teller, for example, would not have the skill, account access, and autonomy to execute this type of scheme.

Furthermore, U.S.S.G. §3B1.3, Application 2(B), titled Application of Adjustment in Certain Circumstances, carves out specific scenarios where the adjustment would apply and states that an adjustment under this guidelines shall apply to a defendant "who exceeds or abuses the authority of his or her position in order to obtain, transfer, or issue unlawfully, or use without authority, any means of identification." By way of example, the note describes three scenarios in which the Sentencing Commission intended the special skill enhancement to apply:

> The following are examples to which this subdivision would apply: (i) an employee of a state motor vehicle department who exceeds or abuses the authority of his or her position by knowingly issuing a driver's license based on false, incomplete, or misleading information; (ii) a hospital orderly who exceeds or abuses the authority of his or her position by obtaining or misusing patient identification information from a patient chart; and (iii) a volunteer at a charitable organization who exceeds or abuses the authority of his or her position by obtaining or misusing identification information from a donor's file.

U.S.S.G. §3B1.3, Application Note 2(B). The examples provided by the Sentencing Commission make very clear that the adjustment should apply in this case. Similar to these examples, Defendant exceeded, and abused, the authority of his position in order to obtain, transfer, and use without lawful authority, the means of identification of numerous bank customers. This fact can

hardly be debated based on the totality of the evidence presented and the jury's verdict. Therefore, the Court should apply a 2-level adjustment pursuant to U.S.S.G. §3B1.3.

4. Defendant Obstructed or Impeded the Administration of Justice

Pursuant to U.S.S.G. §3C1.1, "if (1) the defendant willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice with respect to the investigation, prosecution, or sentencing of the instant offense of conviction, and (2) the obstructive conduct related to (A) the defendant's offense of conviction and any relevant conduct; or (B) a closely related offense." "Obstructive conduct that occurred prior to the start of the investigation of the instant offense of conviction may be covered by this guideline if the conduct was purposefully calculated, and likely, to thwart the investigation or prosecution of the offense of conviction." (U.S.S.G. §3C1.1, Application Note 1). Obstructive conduct can vary widely in nature, degree of planning, and seriousness and therefore the conduct to which this adjustment applies is not subject to precise definition. (*See* U.S.S.G. §3C1.1, Application Note 3).

Probation correctly included an adjustment under U.S.S.G. §3C1.1 based on the Defendant filing a complaint with the FBI's Internet Crime Complaint Center (IC3) (Gov't Ex. 833). The complaint, made after Defendant was fired by Charles Schwab, was digitally signed by the defendant on April 25, 2023, affirmed to as true and accurate, and with the understanding that providing false information could result in a fine, imprisonment, or both pursuant to 18 U.S.C. § 1001. In the complaint, the Defendant portrayed himself as the victim of identity theft and claimed that his Schwab brokerage account was hacked and over $55,000 was transferred into his account and subsequently used for trading without his knowledge. He stated that he received no email notifications about the trades and his home internet was not working normally for several weeks in 2023. Defendant theorized there were two data breaches, one at Key Bank and one at Charles

Schwab, which caused a hacker to steal his identity and commit these crimes. Throughout the investigation and prosecution of the case, Defendant maintained he was hacked and he was a victim.

A few days prior to filing the IC3 complaint, Defendant filed a police report with the Winfield Police Department in Illinois reporting the $50,000 transfer into his brokerage account as fraud (presumably by hacker) and further stated he was being framed by his former employee. Defendant also filed a report with Robinhood, after Charles Schwab mentioned the transaction, claiming that a prior $100 deposit into his account was fraudulent and the result of his identity being stolen. Despite this reporting, and as noted by the PSR, the investigation found no evidence of hacking or unauthorized access into Defendant's accounts. (Final PSR at ¶ 21).

Prior to the start of the investigation by law enforcement, Defendant was already attempting to thwart an investigation. For example, Defendant purposely used VPNs to log into victim accounts and set his server locations in various other cities. Once caught by his employer, the Defendant pretended to be a victim himself and submitted these various VPN server locations as evidence why he couldn't have conducted the unlawful transfers. With respect to the Bluebird cards, after applying for each card in the victims' names, Defendant immediately changed the account address so as to have the card sent to him directly and then, upon receiving the card, immediately changed the address back to the victim's address. Defendant, after being caught, also cancelled at least one account linkage previously established between a victim's account and a brokerage account in Defendant's name.

Additionally, although one or more victims notified local law enforcement authorities about their stolen funds, no investigations independently identified Defendant as a suspect. It was only after Defendant attempted to purchase stocks within B.G.'s account in March 2023 that the

investigation into Defendant began. Without this event occurring, Defendant's crimes likely would have gone unsolved, filed away with all the other unidentified bank account fraud cases. It took fraud teams from two different banks and a referral to the FBI to move the investigation forward. But even then, S.A. Balwin had to sort through Defendant's hacker theory put forth in his IC3 complaint. S.A. Baldwin sought the Defendant's email records to identify whether, or not, the Defendant did receive email notifications about the trades occurring in his Charles Schwab brokerage account after B.G. funds were deposited. S.A. Balwin discovered that Defendant had deleted hundreds of Schwab trade notification emails associated with his options trading with B.G.'s funds. Additionally, S.A. Baldwin sought records from Defendant's internet service provider and specifically requested complaints he filed about his internet service of which there was none. During the investigation, S.A. Baldwin also called Defendant, stating that she was following up on his IC3 complaint. Defendant again doubled down and reiterated all the points of his original complaint in a further attempt to thwart the investigation.

Throughout the investigation and prosecution, much effort has been spent on defeating the claims Defendant put forth in his IC3 complaint. Based on this and the arguments above, the Court should apply a 2-level adjustment pursuant to U.S.S.G. §3C1.1.

5. <u>Defendant's Offenses Involved Sophistication Means</u>

Although the specific offense characteristic for sophisticated means pursuant to U.S.S.G. §2B1.1(b)(10)(C) was neither identified by probation nor objected to by the Government, it is nonetheless applicable. U.S.S.G. §2B1.1(b)(10)(C) applies if "the offense otherwise involved sophisticated means and the defendant intentionally engaged in or caused the conduct constituting sophisticated means." The term sophisticated means "means especially complex or especially intricate offense conduct pertaining to the execution or concealment of an offense." (U.S.S.G.

§2B1.1(b)(10)(C), Application Note 9(B)). Additionally, "conduct such as hiding assets or transactions, or both, through the use of fictitious entities, corporate shells, or offshore financial accounts also ordinarily indicates sophisticated means." *Id*. If the conduct that forms the basis for this enhancement is the only conduct that forms the basis for an adjustment under §3C1.1 (Obstructing or Impeding the Administration of Justice), the Court should not apply that adjustment under §3C1.1. In this case, there are separate, independent basis for the applicability of this enhancement other than the filings of the IC3 report.

Defendant's scheme was sophisticated. After running queries to identify elderly customers in their 90s or 100s who had high account balances that had not yet enrolled in online banking, Defendant methodically enrolled many of them into online banking. This process involved establishing email accounts, usernames, and passwords for the victims. Defendant then transferred money from the victims' accounts to various accounts including unauthorized, fictious accounts he created in the victims' names without their knowledge. For example, Defendant created multiple unauthorized brokerage accounts at Tastytrade, a brokerage that catered to active options traders. Defendant also created an account for himself at Tastytrade. Evidence at trial demonstrated that one of the victim's accounts, which was controlled exclusively by Defendant, was trading options with Defendant's own account in a manner that was indicative of fraud. This was just one of several examples of Defendant's sophisticated offense conduct.

A timeline of actions taken by Defendant provides a glimpse of Defendant's complex and intricate execution of his scheme and concealment of his offenses. (See Gov't Ex. 835). Based on this and the arguments above, the Court should apply a 2-level adjustment pursuant to U.S.S.G. §2B1.1(b)(10)(C).

**B. A Sentence at the High End of the Guidelines is Warranted**

Defendant was hired by Key Bank and Schwab to protect the bank and its customers. Instead, he intentionally harmed the banks' most vulnerable customers. Defendant's conduct was especially egregious given how many very elderly customers, in their 90s and 100s, were specifically targeted. Due to their advanced age and the fact that they had not enrolled in online banking, Defendant assumed the victims would not notice the transfers. Unfortunately, and not surprising, several of Defendant's victims passed away shortly after the theft occurred or during the investigation/prosecution of the case. In fact, the government was unable to call any of the victims to trial. Defendant's targeting of these victims is an aggravating factor under a § 18 U.S.C. § 3553(a) analysis.

Additionally, general deterrence is a particularly important consideration in this type of case. *See United States v. Musgrave*, 761 F.3d 602, 609 (6th Cir. 2014) (finding that a sentence for white-collar crime must reflect the need for general deterrence because these crimes are "especially susceptible to general deterrence"); *United States v. Martin*, 455 F.3d 1227, 1240 (11th Cir. 2006) ("Because economic and fraud-based crimes are 'more rational, cool, and calculated than sudden crimes of passion or opportunity,' these crimes are 'prime candidate[s] for general deterrence.'" (quoting Stephanos Bibas, *White-Collar Plea Bargaining and Sentencing After Booker*, 47 WM. & MARY L. REV., 721, 724 (2005))).

In this case, a Guidelines sentence at the high end meets the requirements for a sentence that is sufficient, but not greater than necessary, to comply with the purposes of the § 3553(a) factors.

## V. RESTITUTION

The government requests this Court order a restitution constant with the PSR with one exception. Recently, the government has identified Tastytrade as suffering a loss of $7,215.09 related to the Defendant's conduct. The government would request this amount be added to the restitution order.

## VI. CONCLUSION

For the reasons outlined above, the United States requests the Court to impose a Guidelines sentence at the high end of the range with a restitution order.

Respectfully submitted,
DAVID M. TOEPFER
United States Attorney

By: /s/ Edward D. Brydle
Edward D. Brydle (OH: 0083243)
Assistant United States Attorney
Michael L. Collyer (OH: 0061719)
Assistant United States Attorney
801 West Superior Avenue, Suite 400
Cleveland, OH 44113
(216) 622-3875
(216) 522-2403 (facsimile)
Edward.Brydle@usdoj.gov
Michael.Collyer@usdoj.gov